IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

CHRISTOPHER C. CULVER,
        Plaintiff,

vs.                                                        Case No. 5:10cv249/RH/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
        Defendant.
_____/

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq.*  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are not supported by substantial evidence; thus, the decision of the Commissioner should be reversed and remanded.

I.      PROCEDURAL HISTORY

On November 12, 2003, Plaintiff protectively filed an application for DIB and alleged disability beginning August 14, 2003 (Tr. 18).[1]  Plaintiff's application was denied initially and on reconsideration (*id.*).  On August 22, 2007, following a hearing, an administrative law judge ("ALJ") rendered a decision in which he found Plaintiff "not disabled" (Tr. 18–26).  After considering

_____

[1] All references to "Tr." refer to the transcript of Social Security Administration record filed on February 7, 2011 (Doc. 9).  Moreover, the page numbers refer to those found on the upper right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system.

additional evidence submitted by Plaintiff, the Appeals Council ("AC") denied Plaintiff's request for review (Tr. 6–9).  This appeal timely and properly followed the AC's denial of review.

## II.    FINDINGS OF THE ALJ

In a decision dated August 22, 2007, the ALJ made several findings relative to the issues raised in this appeal (*see* Tr. 18–26):

1)    Plaintiff is insured under the Act through December 31, 2006.

2)    Plaintiff has not engaged in substantial gainful activity during the time frame relevant to this appeal.[2]

3)    Plaintiff has the following severe impairments: neck pain with radicular symptoms, signs of cervical radiculopathy affecting the C7 nerve root on the left, headaches, dysthymic disorder, and borderline intellectual functioning.

4)    Plaintiff has no impairment or combination of impairments that meets or medically equals a listed impairment.

5)    Plaintiff has the residual functional capacity ("RFC") to perform medium to light work.

6)    Plaintiff can understand, recall, and carry out simple, routine tasks and sustain such tasks over the course of a normal workday and workweek.

7)    Plaintiff can perform his past relevant work as maintenance worker—a medium, semi-skilled job, performed by Plaintiff at the light exertional level—because that work does not involve work-related activities precluded by Plaintiff's RFC; therefore, he is not disabled.[3]

## III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  <u>Carnes v. Sullivan</u>, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* <u>Lewis v. Callahan</u>,

---

[2] The relevant time frame is August 14, 2003 (alleged onset) to December 31, 2006 (date last insured).

[3] In a subsequently filed application for DIB, Plaintiff was found disabled as of September 10, 2007 (Tr. 7).

125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her/his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.     If the claimant is performing substantial gainful activity, he is not disabled.

2.     If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.     PLAINTIFF'S PERSONAL AND MEDICAL HISTORY

A.      Personal History

Plaintiff was born on September 10, 1952, and thus was fifty years old on the date he alleges he became disabled (Tr. 54).  He has a lengthy work history, from approximately 1976 through mid-2003, during which he worked as a garbage collector, maintenance worker, landscaper, and "first helper" at a paper company (Tr. 28, 93, 102).  Plaintiff discontinued working after he fell off a garbage truck and injured his neck (see Tr. 93, 338).  The injury required surgery, which was performed in September 2003 (Tr. 83, 340).

Plaintiff's educational background and literacy skills are unclear (as will be discussed more fully, infra).  For example, Plaintiff testified at his hearing in May 2006 that he attended school through the eighth grade in special education classes, did not obtain a general equivalency diploma, and cannot read or write (Tr. 336–37).  Elsewhere, however, Plaintiff reported that he completed the twelfth grade in regular classes and can read and write (Tr. 82, 89).  With regard to physical abilities,

Plaintiff estimated at his hearing that he cannot lift more than five pounds, sit more than fifteen minutes, stand more than three minutes, walk more than five minutes, or perform activities of daily living except for driving (Tr. 340, 343–44, 348, 353).  He also testified that he has headaches about three times a week that last about four hours, but he noted that with medication the headaches subside within an hour  (Tr. 340–42).

      B.      Relevant Medical History – Physical and Mental[4]

            Physical Medical History

Plaintiff fell from a garbage truck on January 10, 2003. On May 7, 2003, he was evaluated by Douglas L. Stringer, M.D., and diagnosed with cervical disc disease, neck pain, paresthesias of the upper extremities, and continuing neck, arm, shoulder, back, and right leg pain after resolution of transient quadriparesis.  Dr. Stringer recommended surgery for spinal stenosis at C3 through C6. In July 2003, Plaintiff saw Gustavo Arriola, M.D., for a second opinion as to possible surgery.  Dr. Arriola diagnosed cervical spondylosis with stenosis of the canal at multiple levels from C3 to T1.

On August 5, 2003, Plaintiff underwent a myelogram, which revealed evidence of a disc protrusion at C7-T1 causing mild edema of the C8 nerve root, with disc protrusions at C3 through C6.  As a result, Dr. Arriola recommended surgery involving a decompressive laminectomy.  On September 4, 2003, Plaintiff underwent laminoplasty of C3 through C7, and lateral mass fusion on the left due to cervical stenosis secondary to a combination of disc herniation and degenerative changes from C3 through C7.  On September 9, 2003, Dr. Arriola noted that Plaintiff was doing well and prescribed Flexeril and Lortab upon discharge.  Plaintiff subsequently underwent physical therapy. In December 2003, Plaintiff saw Dr. Arriola and stated he was doing well but was experiencing headaches.  In February 2004, Dr. Arriola released Plaintiff to "light duty" with no repetitive flexion of the cervical spine and no lifting more than forty pounds above the shoulder.

Mary Elizabeth Seay, M.D., a non-examining agency physician, completed a Physical RFC Assessment on February 18, 2004, and rendered opinions generally consistent with a finding that

---

[4] Unless otherwise noted, the information in this section is derived—nearly verbatim—from Plaintiff's memorandum in support of his complaint (Doc. 13).

Plaintiff is capable of performing medium exertional activity (Tr. 214–21).[5] More specifically, Dr. Seay opined that Plaintiff is able to frequently lift or carry twenty-five pounds and occasionally lift or carry fifty pounds (Tr. 215). She further opined that Plaintiff can stand, sit, or walk six hours in an eight-hour workday, with no limits in his ability to push or pull (Tr. 215). Additionally, she determined that Plaintiff has no postural, manipulative, visual, communicative, or environmental limitations (Tr. 216–18). Approximately six months later, a second non-examining agency physician rendered opinions that are essentially identical to those of Dr. Seay (*see* Tr. 225–32).

On April 12, 2004, Plaintiff returned to Dr. Arriola and reported left shoulder discomfort and headaches. Dr. Arriola prescribed Fiorinal for the headaches and opined that Plaintiff needed an orthopedic evaluation for his shoulder. In June 2004, he reiterated that Plaintiff needed an evaluation, and he prescribed an MRI in anticipation of an eventual orthopedic evaluation.

On July 12, 2004, Plaintiff was examined by Iqbal Faruqui, M.D., at the Commissioner's request. Dr. Faruqui reviewed a November 23, 2003 MRI, which he noted was essentially normal but with increased density at C5 consistent with prior surgery and ostephytes at C4 through C6. Dr. Faruqui noted that no records were available from the neurosurgeon but that such records would be helpful. He also recommended a physical capacity, psychological, and speech assessment. Finally, Dr. Faruqui noted that Plaintiff may not be able to perform heavy work and may have difficulty finding sedentary work because of his limited education and inexperience in other work fields.

On January 27, 2005, Plaintiff saw Dr. Arriola and complained of increasing neck pain radiating into his shoulder and into the fingers of his left hand. A muscle relaxer and anti-inflammatory were prescribed. On March 18, 2005, a cervical spine MRI was obtained. It revealed a moderately large disc extrusion at C4-5 causing some deformity of the spinal cord, a moderately large disc herniation at C5-6 causing mild deformity of the spinal cord, mild disc degeneration at multiple levels with small disc bulges or minor protrusions, and hypertrophy causing narrowing of the neural foramen at C3-4, in addition to post-surgical changes.

---

[5] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c).

In February 2007, Keith Banton, M.D., completed a Medical Source Statement ("MSS") provided by Plaintiff's counsel (Tr. 294, 299).[6]  Dr. Banton opined that Plaintiff can frequently or occasionally lift less than ten pounds; stand or walk less than two hours in a workday; sit six hours in a workday; occasionally climb, reach and handle; and frequently balance (Tr. 296–98).[7]

At the ALJ's request, Plaintiff was examined by neurologist E. Jacob, M.D., on March 29, 2007.  Dr. Jacob noted limited range of motion of the cervical spine and depressed reflexes of the triceps, knee, and ankle with sensory impairment at the C6-C7 dermatome on the left side.  Dr. Jacob diagnosed neck pain with radicular symptoms, signs of cervical radiculopathy affecting the C7 nerve root on the left, and mild to moderate obesity.  Dr. Jacob opined that Plaintiff can lift ten pounds occasionally with the left hand and twenty pounds occasionally with the right hand, lift less than ten pounds frequently with the left hand but ten pounds frequently with the right hand, and stand or walk and push or pull without restriction (Tr. 303–04).  He further noted that Plaintiff's ability to look up and down is affected but can be improved with gradual stretching exercises (Tr. 304).

Mental Health History (evidence before the ALJ)

On September 2, 2004, Plaintiff was evaluated by Damon LaBarbera, Ph.D., at the Commissioner's request.  Dr. LaBarbera noted that Plaintiff had some trouble understanding even when he (Dr. LaBarbera) avoided the use of complicated statements or difficult terms (see Tr. 233).  Dr. LaBarbera administered memory testing, which indicated "extremely low" scores with "across the board deficits in memory" (Tr. 234, 236).  IQ scores were not reported, but Dr. LaBarbera noted that he administered some subtests from the Wechsler Adult Intelligence Scale-III ("WAIS-III") (Tr. 233).  He opined that the subtest scores suggest Plaintiff's "IQ will probably fall in the mentally deficient or borderline range" (Tr. 233).  Dr. LaBarbera's ultimate conclusion was that "[b]orderline intellect and functioning is suggested," and he diagnosed Plaintiff with dysthymic disorder and borderline intellectual functioning (Tr. 233, 236).

---

[6] Plaintiff's counsel originally asked Dr. Arriola to complete the MSS, but Dr. Arriola refused to do so because he had not treated Plaintiff in over a year.  Thus, the MSS was completed by Dr. Banton, who had seen Plaintiff on only one occasion (on October 31, 2006) prior to completing the MSS (see Tr. 294, 326–31).

[7] Plaintiff submitted to the AC treatment records from Dr. Banton, dated October 31, 2006, through November 10, 2008 (Tr. 326–31), but they have no bearing on the undersigned's conclusions.

On December 6, 2004, Angela C. Register, Ph.D., completed a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique form (Tr. 237–53).  In summary, she opined that Plaintiff has at most moderate functional limitations and is capable of performing simple, routine tasks (Tr. 237–39).  She evaluated Plaintiff's borderline intellectual functioning under Listing 12.02 (Organic Mental Disorders) and dysthymic disorder under listing 12.04 (Affective Disorders), but she concluded that neither listing was met or equaled (Tr. 240–43, 250–51).

<u>Mental Health History (evidence presented to the Appeals Council)</u>

On June 23, 2008, Plaintiff was evaluated by psychologist Brent Decker, Ph.D., at his attorney's request (*see* Tr. 316).  Dr. Decker administered the WAIS-III and assessed Plaintiff's adaptive functioning.  He reported Plaintiff's IQ scores as 68 (verbal), 76 (performance), and 69 (full scale ) (Tr. 319).  He also noted that Plaintiff tested at the kindergarten reading level and first grade writing level, and he classified Plaintiff's adaptive skills as "extremely low" (Tr. 321).  Dr. Decker diagnosed mild mental retardation, with no other additional mental impairments.

V.    DISCUSSION

Plaintiff raises three issues and one sub-issue in this appeal, which the undersigned addresses in the following order:  (1) the ALJ erred in determining that Plaintiff's past work as a maintenance worker is "past relevant work"; (2) the ALJ erred in determining Plaintiff's RFC because the RFC is inconsistent with medical evidence "credited" by the ALJ; and (3) the ALJ erred at step three of the sequential evaluation in failing to conclude that Plaintiff's mental retardation meets or equals Listing 12.05C or, alternatively, that the AC erred in its consideration of new evidence related to this claim, that is, Dr. Decker's report (*see* Doc. 13 at 9–19).

A.    Past Relevant Work

The ALJ found Plaintiff "not disabled" at step four because he determined Plaintiff could return to his past relevant work ("PRW") as a maintenance worker.  Plaintiff contends the ALJ erred because this past work is not PRW, as that term is defined in the regulations (*see* Doc. 13 at 15–19).  More specifically, Plaintiff asserts that the work did not meet the substantial gainful activity ("SGA") threshold since Plaintiff did not earn enough money in the position (*id.*).  The undersigned will summarize the evidence relevant to this claim before addressing its merits.

On a work history report form dated January 5, 2004, Plaintiff reported that he performed maintenance work for the Gulf County School District ("GCSD") from October 2001 through July 2002 (Tr. 102, 109).[8]  Plaintiff also reported that he worked forty hours a week and earned ten dollars an hour in this position, and he described the physical requirements of the job (Tr. 104). Additionally, during Plaintiff's hearing the ALJ asked a vocational expert ("VE") questions regarding Plaintiff's past work as a maintenance worker "from . . . 2001 and 2002" and whether Plaintiff could return to that work (Tr. 356).  And, the VE created a written "Past Relevant Work Summary," on which he characterized Plaintiff's past maintenance work, from 2001 to 2002, as PRW (Tr. 157).  The VE also noted on the summary that maintenance work is semi-skilled work, generally performed at a medium exertional level, but performed by Plaintiff at the light exertional level (*id.*).  Finally, the earnings records in Plaintiff's file reflect income in the amount of $11,914.53 from Southeastern Outdoor Management in 2000; no income in 2001; income in the amount of $4,743.00 from Seacliffs Master Association and $1,050.00 from Aztec Environmental in 2002, for a total income of $5,793.00 in 2002; and income in the amount of $11,600.00 from Aztec Environmental in 2003 (Tr. 68).

Past relevant work is "work that you have done within the past 15 years, that was [SGA], and that lasted long enough for you to learn to do it."  20 C.F.R. § 404.1560(b).  "Substantial work activity is work activity that involves doing significant physical or mental activities.  Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before."  20 C.F.R. § 404.1572.  "Gainful work activity is work activity that you do for pay or profit.  Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized."  Moreover,

> [i]n evaluating whether the claimant's past work is substantial gainful activity, the ALJ's 'primary consideration will be the earnings [the claimant] derive[d] from the work activity.'  20 C.F.R. § 416.974(a)(1).  Under the regulations' earnings guidelines, a claimant's earnings (in 2001 and each year thereafter) ordinarily will show that he engaged in substantial gainful activity if the earnings were more than the previous year or the average monthly earnings were more than $700, adjusted for

---

[8] Other work history reports do not reflect this employment (*see, e.g.*, Tr. 93, 150–51); thus, the January 2004 work history report is the only evidence of Plaintiff's past work as a maintenance worker.

changes in the national average wage index.  *See* 20 C.F.R. § 416.974(b)(2)(i)–(ii), *see also id.* § 416.974a (explaining that to determine whether a claimant is doing substantial gainful activity, the ALJ will average monthly earnings).

McCrea v. Astrue, 407 Fed. Appx. 394, 396 (11th Cir. 2011).[9]

Here, the record is inconsistent regarding Plaintiff's earnings related to the maintenance worker position.  Initially, the January 2004 work history report reflects weekly earnings as a maintenance worker for the GCSD, from October 2001 through July 2002, in the amount of $400.00, which is approximately $1,200.00 a month and significantly more than the monthly income threshold required for SGA.  The earnings records from 2001, however, reflect <u>no</u> income whatsoever.  Additionally, the earnings records from 2002 show income from sources <u>other than</u> the GCSD, which income, even if it is construed as income from a maintenance worker position,[10] falls well below the threshold amount for SGA.  Moreover, the income reflected on the earnings records for 2001 and/or 2002 is far less than the income reported for 2000, so Plaintiff's employment in 2001 or 2002 cannot be considered SGA based on "earnings [that] were more than the previous year."  <u>McCrea</u>, 407 Fed. Appx. at 396.  Finally, although the earnings records suggest employment in 2002 with Seacliffs Master Association, a job Plaintiff never reported, the ALJ asked no questions about this discrepancy.  Thus, as in <u>McCrea</u>, the ALJ did not have the necessary information to determine whether Plaintiff's prior work as a maintenance worker qualified as substantial gainful activity and thus was past relevant work he could perform.  <u>McCrea</u>, 497 Fed. Appx. at 397.  The ALJ's failure to address the aforementioned discrepancies is particularly troubling because the ALJ discovered during Plaintiff's hearing that some of the earnings records in the file were not his, and the ALJ went so far as to suggest that Plaintiff might be the victim of identity theft (*see* Tr. 352).  For example, the earnings records reflect income in 2003, 2004, and/or 2005 from a business in New

---

[9] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or Supplemental Security Income ("SSI"), but separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416).  Therefore, the <u>McCrea</u> decision is applicable here, even though it concerns a claim for SSI and references § 416.

[10] Construing the 2002 income in this manner is quite a stretch, given that the ALJ knew that Aztec Environmental was the company Plaintiff worked for as a <u>garbage collector</u> (*see* Tr. 350–51 (discussing Plaintiff's employment as a garbage collector with Aztec in 2003); *see also* Tr. 93 (disability report reflecting same)).  And, Plaintiff's work as a maintenance worker clearly was not for Seacliffs Master Association, the only other company that reported earnings for Plaintiff in 2002.

York, a California Pizza Kitchen in Los Angeles, and a McDonalds restaurant in Georgia (Tr. 60–61, 351–52).  Plaintiff testified that these were not his earning records, he did not work after mid-2003, and he did not work in New York, California, or Georgia (Tr. 351–52).

Furthermore, the ALJ failed to ask Plaintiff any questions about his prior work as a maintenance worker, such as how he performed it, when he performed it, or how long he performed it.  The ALJ inquired only about Plaintiff's past work as a garbage collector and first helper at the paper mill (Tr. 337–39).  Similarly, the ALJ failed to question Plaintiff about the work history report, which is the only direct evidence in the file regarding his past work as a maintenance worker, and which the VE relied upon in forming his opinions that Plaintiff performed this work at the light exertional level and could return to it (under the circumstances presented by the ALJ in a hypothetical question (see Tr. 354–57)).

The ALJ has an obligation to develop a full and fair record.  Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997).  Remand for further development of the record is appropriate when there are evidentiary gaps that result in prejudice.  Brown v. Shalala, 44 F.3d 931, 935 (11th Cir. 1995).  Here, the ALJ relied on Plaintiff's employment in 2001 and 2002 in finding Plaintiff "not disabled."  Thus, his duty to resolve discrepancies concerning Plaintiff's work history and income during that time frame was of heightened importance.  Moreover, the ALJ made no alternative finding (e.g., that Plaintiff could perform other available jobs even if he could not return to his past work as a maintenance worker).  Thus, no alternative basis exists for upholding the ALJ's decision.  In short, the ALJ's decision is not supported by substantial evidence on the record as a whole, and under these circumstances remand for further development of the record is appropriate.  See 42 U.S.C. § 405(g); Jackson v. Chater, 99 F.3d 1086, 1092 (11th Cir. 1996) (explaining that a "remand to develop a full and fair record in accordance with law is a sentence-four remand").

B.    Residual Functional Capacity Determination

Plaintiff contends the ALJ's RFC determination is flawed, because he failed to include in the RFC certain restrictions imposed by physicians whose opinions he credited, and his finding that Plaintiff is able to perform "light to medium" work is unclear (see Doc. 13 at 9–11).  Because the RFC determination is intertwined with the ALJ's unsupported finding at step four regarding Plaintiff's ability to return to PRW, the undersigned need not address this contention.  Upon remand,

however, the ALJ should consider the contentions Plaintiff has raised here in redetermining Plaintiff's RFC.

  C.  Listing 12.05C

  Plaintiff contends that the record as a whole, including evidence submitted to the AC, supports a finding that his mental impairment meets or equals Listing 12.05C, the listing for mental retardation, and that the Commissioner erred in failing to so find.

  The Commissioner's rules provide that if a claimant has an impairment that is listed in or equal to an impairment listed in Appendix 1, Subpart P, following 20 C.F.R. § 404.1599, a finding of disability will be made at step three without considering the claimant's age, education, and work experience. 20 C.F.R. § 404.1520(d). "The Secretary explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard. The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just 'substantial gainful activity.'" Sullivan v. Zebley, 493 U.S. 521, 532, 110 S. Ct. 885, 892, 107 L. Ed. 2d 967 (1990). A claimant is entitled to benefits if it is shown that his limitations meet, or are medically or functionally equal to, the limitations set forth in the listing. Shinn ex rel. Shinn v. Comm'r., 391 F.3d 1276, 1282 (11th Cir. 2004).

  A claimant has the burden of proving that his impairments meet or equal a listed impairment by presentation of specific evidence of medical signs, symptoms, or laboratory test results meeting all of the specified medical criteria. Sullivan, 493 U.S. at 530. "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Id.

  Listing 12.05 begins with an introductory paragraph, that states, "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05. The listing further provides that the "required level of severity for this disorder is met when the requirements in [subsections] A, B, C, or D are satisfied." Id. And, relevant to the instant claim, subsection C requires, "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation

of function." *Id.*, § 12.05C.  The Eleventh Circuit has determined that in order to be considered for disability benefits under Listing 12.05, a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive functioning; and (3) have manifested deficits in adaptive behavior before age twenty-two.  Pettus v. Astrue, 226 Fed. Appx. 946, 948 (11th Cir. 2007) (citing Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997)).  Additionally, consistent with the terms of the listing, the Eleventh Circuit has stated that for presumptive disability under 12.05C, a claimant must have (1) a valid IQ score of 60 through 70 inclusive, and (2) an additional mental or physical impairment significantly affecting the claimant's ability to work.  *Id.* at 1219–20.

It is evident here that Plaintiff has a physical impairment that imposes "an additional and significant work-related limitation of function."  As previously noted, the ALJ determined that Plaintiff's neck pain with radicular symptoms, signs of cervical radiculopathy affecting the C7 nerve root on the left, and headaches—among other impairments—are "severe" impairments, which by definition are impairments that significantly limit physical or mental ability to perform "basic work activities."  *See* 20 C.F.R. § 404.1520(c); *see also, e.g.*, Etheridge v. Astrue, No. 08-00357/WS/B, 2009 WL 3233899 (S.D. Ala. Sep. 29, 2009) (finding of severe physical impairments at step 2 *ipso facto* was a finding that claimant had shown an impairment as required by the second prong of Listing 12.05C); Carroll v. Astrue, No. 1:08cv74/SRW (M.D. Ala. June 17, 2009), 2009 WL 1708073, at *2 (same).  The question thus becomes whether the record contains evidence of a valid IQ score between 60 and 70.  Plaintiff points to the IQ scores assessed by Dr. Decker, as reflected in the records he submitted to the AC (Doc. 13 at 12).[11]  Indeed, as previously noted, Dr. Decker administered the WAIS-III test to Plaintiff, which resulted in IQ scores of 68 (verbal), 76 (performance), and 69 (full-scale) (Tr. 319).

While both the verbal and full-scale IQ scores fall within the criteria set forth in Listing 12.05C, the scores alone do not satisfy the criteria of the listing.  First, the scores are inconsistent

---

[11] Evidence submitted to the AC must be considered by this court.  *See* Ingram v. Astrue, 496 F.3d 1253, 1262–64 (11th Cir. 2007).  More particularly, this court should determine whether the "new evidence renders the denial of benefits erroneous," *id.*, at 1262, or similarly, whether there is a "'reasonable possibility that [the new evidence] would change the administrative result.'"  Robinson v. Astrue, 365 Fed. Appx. 993, 996 (11th Cir. 2010) (quoting Milano v. Bowen, 809 F.2d 763, 766 (11th Cir. 1987)).

with other evidence in the record.  For example, Plaintiff has a very lengthy work history, as the ALJ noted (*see* Tr. 25); it spanned approximately twenty-seven years (i.e., from 1976 to 2003) and began at or about the age of twenty-four.  Moreover, according to Plaintiff's own reports, during this employment he supervised other people; was a "lead worker"; completed reports; used machines, tools, or equipment; and used technical knowledge or skills, including skills derived from specialized training in mechanics (Tr. 94, 97, 103–04).  Additionally, Plaintiff earned significant income during his employment (*see, e.g.*, Tr. 59 (reflecting annual income between $20,0000 and $36,000 over a sixteen-year, consecutive period)).  This evidence regarding Plaintiff's work history belies a finding that he has deficits in adaptive functioning that initially manifested prior to the age of twenty-two.  *See* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) ("This court . . . has recognized that a valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record on the claimant's daily activities and behavior.")[12] (citing Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir. 1986) (rejecting claim of mental retardation under 12.05C where claimant's IQ score of 69 was inconsistent with evidence that he had a two-year college associate's degree, was enrolled in a third year of college as a history major, and had worked in various technical jobs such as administrative clerk, statistical clerk, and algebra teacher))[13]; *see also* Bischoff v. Astrue, No. 07-60969-CIV,  2008 WL 4541118 (S.D. Fla. Oct. 9, 2008) (affirming determination that Listing 12.05C was not met even though IQ scores were below 70, noting (among other factors) that claimant previously worked as a parts manager and automobile mechanic, jobs which required technical knowledge and skills, and he successfully supervised other people for five years); Davis v. Astrue, No. 2:07cv880/TFM, 2008 WL 2939523 (M.D. Ala. Jul. 25, 2008) (although claimant had an IQ score under 70, she had completed twelfth grade, received training in cosmetology and secretarial skills, had a driver's license, was able to read, write, and perform simple

---

[12] In Lowery, the Commissioner conceded that the IQ score was valid and that the claimant had additional work-related limitations.  979 F.2d at 838.  Hence, the only issue was whether there was evidence that the mental retardation manifested itself before age twenty-two.  *Id.*

[13] The undersigned recognizes that in Hodges v. Barnhart, 276 F.3d 1265, 1268 (11th Cir. 2001), the court held that "absent evidence of sudden trauma that can cause retardation, the IQ tests create a rebuttable presumption of a fairly constant IQ throughout her life."  But a valid IQ score is not conclusive of mental retardation where, as here, the IQ score is inconsistent with other evidence in the record.  *See id.* (also citing Popp, 779 F.2d at 1499).

math, and a consulting psychologist had determined she was in the borderline level of intellectual functioning rather than mildly retarded); <u>Lyons v. Astrue</u>, No. 2:08cv614/FtM/29/SPC, 2009 WL 1657388 (M.D. Fla. Jun. 10, 2009) (claimant did not meet IQ criteria where he obtained a high school diploma, did not take special education classes, took care of his personal needs, earned from $13,000 to $18,000 per year for seven years, and there was evidence that he was malingering when he took the intelligence tests).  Thus, the undersigned concludes that neither the ALJ nor the AC erred, as the evidence does not support a finding that Plaintiff's impairment meets or equals Listing 12.05C.  Stated another way, the new evidence would not change the administrative result.

Nevertheless, since Dr. Decker's report is now part of the file, and it contains IQ scores below 70, upon remand the ALJ should—independent of the undersigned's analysis here—consider the criteria of Listing 12.05C and whether Plaintiff's impairment satisfies the criteria.  Moreover, given the inconsistencies in the record as to Plaintiff's education and ability to read and write, the ALJ should determine the true extent of his education and literacy skills since these factors are in dispute, and they are relevant to the criteria of Listing 12.05 (e.g., whether Plaintiff has deficits in "adaptive functioning that initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22").[14]  The ALJ's determination in this regard may also be relevant to the issue of Plaintiff's credibility.

VI.   CONCLUSION

---

[14] Plaintiff acknowledges that the record is inconsistent regarding his education, but he contends he did not fill out the disability forms that reflect he is educated and literate (*see* Doc. 13 at 2 n.2).  The court notes, however, that on a handwritten disability form completed on November 26, 2003, on which it is reported that Plaintiff completed the twelfth grade in regular classes and can read and write, Plaintiff's name appears on the form in response to a query regarding the "[n]ame of the person completing this form" (*see* Tr. 82, 89, 91).  On another form dated December 16, 2003, that appears to have been completed by a claims adjudicator <u>who personally interviewed Plaintiff</u>, it is noted that Plaintiff completed the twelfth grade in regular classes (Tr. 97, 100).  Plaintiff also states that a claims adjudicator noted he could not read or write, and he points to his testimony that he cannot read or write in support of his claim regarding Listing 12.05C.  Plaintiff is reminded, however, that the burden at step three is on the <u>claimant</u>.  *See* <u>Bell v. Bowen</u>, 796 F.2d 1350, 1353 (11th Cir. 1986) ("when a claimant contends that he has an impairment meeting the listed impairments . . . , he must present specific medical findings that meet the various tests listed under the description of the applicable impairment"; alternatively, if a claimant "contends that he has an impairment which is equal to one of the listed impairments, the claimant must present medical evidence which describes how the impairment has such an equivalency"); <u>Wilkinson v. Bowen</u>, 847 F.2d 660, 662 (11th Cir. 1987) (same). Plaintiff's arguments here do not satisfy his burden.  At the very least Plaintiff should have presented his school records to the ALJ or the AC if indeed he completed only the eighth grade in special education classes, as he contends here.

Case No. 5:10cv249/RH//EMT

For the foregoing reasons, the undersigned concludes that the Commissioner's decision is not supported by substantial evidence and should not be affirmed.  *See* 42 U.S.C. § 405(g); <u>Foote</u>, 67 F.3d at1556 (remanding for additional administrative proceedings).

It is therefore respectfully **RECOMMENDED**, pursuant to sentence four of 42 U.S.C. § 405(g), that the decision of the Commissioner be **REVERSED**, that the Commissioner be ordered to remand this case to the Administrative Law Judge for further proceedings consistent with this report and recommendation, and that the Clerk be directed to close the file.

At Pensacola, Florida this 12th day of December 2011.


*/s/ Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**